SMITH v SMITH

Docket No. 273547. Submitted December 5, 2007, at Grand Rapids. Decided March 18, 2008, at 9:05 a.m. Leave to appeal sought.

William J. Smith brought an action in the Kent Circuit Court to terminate spousal support of his ex-wife, Betty Lee Smith, on the ground that she was cohabitating with a man to whom she was not related, which the judgment of divorce indicated would end the plaintiff's support obligation. The court, Kathleen A. Feeney, J., denied the motion after finding that the defendant and the man in question, Philip J. Walsh II, were not cohabitating. The plaintiff appealed, and the defendant cross-appealed the court's denial of her request for attorney fees and costs.

The Court of Appeals *held*:

1. The trial court did not err in interpreting the term "cohabitation" as it was used in the judgment of divorce. Because the term was not defined in the judgment, the court properly relied on dictionaries and persuasive caselaw and made its determination on the basis of the totality of the circumstances after considering many factors, including the extent to which the couple shared a common residence, the nature and relative permanency of their personal relationship, and the degree to which their financial arrangements were shared.

2. The trial court did not clearly err by finding that the defendant and Walsh were not cohabitating. Although the couple has had a monogamous sexual relationship since 2004 and plans to marry eventually, evidence indicated that Walsh did not live with the defendant or contribute toward her household expenses; rather, when not traveling on business, Walsh lived in his own residence in Georgia. Further, the couple did not hold themselves out as living together.

3. The trial court did not abuse its discretion by denying the defendant's request for attorney fees and costs because she did not demonstrate an inability to bear the expense of the action or the plaintiff's ability to do so. The evidence showed that the defendant had recently bought three income-producing rental properties, and there was no evidence to support the disparity that the defendant alleged existed between their incomes.

Affirmed.

DIVORCE — SPOUSAL SUPPORT — COHABITATION — DETERMINING FACTORS.

A court, when determining whether to terminate spousal support on the ground that the support recipient is cohabitating with a person, must consider the totality of the circumstances, including the extent to which the people in question shared a common residence, the nature and relative permanency of their personal relationship, and the degree to which their financial arrangements were shared.

*Kluczynski, Girtz & Vogelzang* (by *Richard Radke, Jr.*), for the plaintiff.

*Mark F. Haslem* for the defendant.

Before: BANDSTRA, P.J., and METER and BECKERING, JJ.

BECKERING, J. Plaintiff appeals by leave granted the trial court's order denying his motion to terminate spousal support. Defendant cross-appeals the trial court's denial of her request for attorney fees and costs. We affirm.

The parties were divorced in June of 1999, following a 17-year marriage during which they had five children. The judgment of divorce required plaintiff to pay defendant $3,500 a month in spousal support, but provided that plaintiff's obligation to pay spousal support would terminate "upon such time as the Defendant cohabitates with a non-related male." In January of 2005, plaintiff moved to terminate spousal support, asserting that defendant was cohabitating with her boyfriend, Philip J. Walsh II. Following an evidentiary hearing, the trial court denied plaintiff's motion to terminate spousal support, finding that defendant and Walsh were not cohabitating.

I

Plaintiff first argues that the trial court erred in its interpretation of the term "cohabitation," as used in

the parties' judgment of divorce. A judgment of divorce is to be construed in light of the trial court's findings of fact and conclusions of law. *Beason v Beason*, 435 Mich 791, 798-799 n 3; 460 NW2d 207 (1990). A trial court generally interprets the terms of a divorce judgment, such as the term "cohabitation," in the same manner that it interprets a contract. *Id*. If the term's meaning is unclear or it is equally susceptible to more than one meaning, as is the case here, interpretation is a question of fact, and the trial court may consider extrinsic evidence to determine the intent of the parties. *Id*.; *Brucker v McKinlay Transport, Inc (On Remand)*, 225 Mich App 442, 448; 571 NW2d 548 (1997). A trial court commits legal error when it incorrectly chooses, interprets, or applies the law. *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994).[1]

The parties' judgment of divorce did not define the term "cohabitation," and there are no authoritative Michigan cases that define the term in the context of terminating an award of spousal support.[2] Therefore, it

---

[1] Defendant argues that the term "cohabitation" should be construed against plaintiff, as the drafter of the judgment of divorce. Our Supreme Court has held, however, that the rule of *contra proferentem*, i.e., that ambiguities are to be construed against the drafter of the contract, should only be applied if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the finder of fact unable to determine what the parties intended their contract to mean. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 470-471, 474; 663 NW2d 447 (2003). Because the trial court relied on conventional rules of contract interpretation, construing the term "cohabitation" against plaintiff as the drafter of the judgment was unnecessary.

[2] In *Passwaters v Passwaters*, unpublished opinion per curiam of the Court of Appeals, issued September 3, 1999 (Docket Nos. 204310, 204311), at 6, this Court found no error in the trial court's interpretation of the term "cohabitation" in the parties' judgment of divorce. The divorce judgment in that case specifically adopted the definition of "cohabitation" in Black's Law Dictionary (5th ed). *Id*. at 5-6. The trial

was appropriate for the trial court to consider the dictionary definition of the term "cohabitation" and caselaw from other jurisdictions that have interpreted the term in a similar context. See *Henderson v State Farm Fire & Cas Co*, 225 Mich App 703, 710; 572 NW2d 216 (1997), rev'd on other grounds 460 Mich 348 (1999) (where no Michigan cases are directly on point regarding the meaning of a phrase, it is appropriate to turn to dictionary definitions and caselaw from other jurisdictions).

In making its findings, the trial court referenced Black's Law Dictionary (8th ed), which defines "cohabitation" as "[t]he fact or state of living together, esp. as partners in life, usu. with the suggestion of sexual relations." Similarly, Ballentine's Law Dictionary (3d ed) defines "cohabitation" as "[a] dwelling together of man and woman in the same place in the manner of husband and wife." After considering the dictionary definition of "cohabitation," the trial court adopted the definition for the term articulated in *Birthelmer v Birthelmer*, unpublished opinion of the Court of Appeals of Ohio for the Sixth District, issued July 15, 1983 (Docket No. L-83-046), 1983 WL 6869, as affirmed and applied in *Dickerson v Dickerson*, 87 Ohio App 3d 848;

court explained that the purpose of spousal support was to allow a spouse in need of support to continue to receive support after a divorce, and that, if the recipient spouse cohabited with another person, such as her mother, the payor's responsibility to pay spousal support would not be abrogated. *Id.* at 6. That is, "merely sharing a home and expenses with another person without romantic involvement does not mandate termination of spousal support." *Id.* On appeal, this Court held that the trial court's reasoning was supported by the dictionary definition of cohabitation, which likens cohabitation to a marriage relationship. *Id.* This Court also pointed out that the term "cohabitation" as used in *Ianitelli v Ianitelli*, 199 Mich App 641, 644-645; 502 NW2d 691 (1993), and *Petish v Petish*, 144 Mich App 319, 321; 375 NW2d 432 (1985), involved situations where the recipient former spouse admitted to living with another person in an apparently romantic manner. *Passwaters, supra* at 6.

623 NE2d 237 (1993), and *Moell v Moell*, 98 Ohio App 3d 748; 649 NE2d 880 (1994). In *Birthelmer, supra,* the Ohio Court of Appeals set out three elements distinguishing genuine cohabitation relationships from those that are not:

> First, there must be an actual living together, that is, the man and woman must reside together in the same home or apartment. Secondly, such a living together must be of a sustained duration. Thirdly, shared expenses with respect to financing the residence (i.e., rent or mortgage payments) and incidental day-to-day expenses (e.g., groceries) are the principal relevant considerations. [*Birthelmer, supra* 1983 WL at *4.]

The trial court noted that, in adopting the *Birthelmer* test, it gave consideration to the fact that Ohio is geographically proximate to Michigan, the case provided a well-reasoned decision for selecting the three factors, and it has since been followed by other Court of Appeals decisions in Ohio that have adopted the three factors and added to them.

In addition to the three elements set out in *Birthelmer*, the trial court considered the following factors: whether defendant and Walsh intended to cohabitate; whether they held themselves out as living together; whether they assumed obligations generally arising from ceremonial marriage; whether a sexual relationship existed; whether marriage was contemplated; whether they used one another's addresses; whether they kept joint accounts; whether they were economically interdependent; and whether defendant used her spousal support to subsidize the alleged cohabitation.

We find that the trial court properly employed this multiple-factor test in determining whether defendant and Walsh were cohabitating. Cohabitation requires

more than briefly living together or regularly engaging in sexual activity. Pursuant to the dictionary definition of cohabitation, the couple must be "living together . . . as partners in life," or "dwelling together . . . in the manner of husband and wife." As 6 Am Jur Proof of Facts 3d, § 2, p 773, states, "[g]enerally, it can be said that courts consider cohabitation to mean a relationship between two persons of the opposite sex who reside together in the manner of husband and wife, mutually assuming those rights and duties usually attendant upon the marriage relationship." Accordingly, courts in other jurisdictions have considered a number of evidentiary factors in determining whether a couple is cohabitating. See, e.g., *Rose v Csapo*, 359 NJ Super 53, 60-61; 818 A2d 340 (2002); *Sanders v Burgard*, 715 So 2d 808, 811 (Ala Civ App, 1998); *Baker v Baker*, 1997 ND 135; 566 NW2d 806, 811-812 (1997); *Moell, supra* at 752-753; *In re Marriage of Herrin*, 262 Ill App 3d 573, 577; 634 NE2d 1168 (1994); *McCarty v McCarty*, 29 Pa D & C3d 687, 692 (1984); *Quisenberry v Quisenberry*, 449 A2d 274, 276-277 (Del Fam Ct, 1982).

Whether cohabitation exists is a factual determination based on the totality of the circumstances. In making a finding on cohabitation, courts should consider many factors. The following are examples: First, courts may consider the living arrangements of the couple and the extent to which they shared a common residence. Did they both keep personal items such as clothing and toiletries at the residence? Did they both have keys to the residence? What mailing address did each party use? Did they share automobiles, or other personal property? Were household duties shared? How long did such arrangements exist? Second, courts may consider the couple's personal relationship and whether it appeared relatively permanent. Did they engage in sexual relations? Was their relationship monogamous?

Was marriage contemplated? Did they spend vacations and holidays together? How did the couple represent their relationship to their family, friends, and acquaintances, and how did those people view the relationship? Third, courts may inquire into the couple's financial arrangements. Did they share expenses? Did they maintain joint accounts? Did they jointly own real or personal property? Did one party support the other? Whether cohabitation exists is a question for the finder of fact. Because no one factor defining a couple's relationship is dispositive on the question of cohabitation, the fact-finder should consider the totality of the circumstances in each particular case.

II

Next, plaintiff argues that the trial court erred in finding that defendant and Walsh were not cohabitating. We disagree. We review a trial court's factual findings for clear error. MCR 2.613(C); *Brucker, supra* at 448. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made, giving due regard to the trial court's special opportunity to observe the witnesses. *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

In finding that defendant and Walsh were not cohabitating, the trial court properly considered the totality of the circumstances. Defendant first met Walsh in 2002, and they have engaged in a monogamous, sexual relationship since 2004. After Walsh's own marriage failed in October of 2003, he moved to Georgia, where he lived with his sister and later purchased a home. He moved back to Michigan in May or June of 2004, but returned to Georgia in September of 2004. He also spent the

summer of 2005 living in Grand Rapids where his ex-wife allowed him to live in their marital home after she moved out, although Walsh had minimal utility charges at the home during this period. Walsh obtained a Georgia driver's license and has no plans to move back to Michigan. He is the CEO of his own marketing firm and travels extensively on a regular basis, almost exclusively in connection with business. For example, a credit-card statement revealed that in a single month, Walsh traveled to North Carolina, South Carolina, Virginia, Florida, Nevada, Louisiana, Texas, Indiana, Kentucky, and Alabama. Walsh estimated that he spends 40 weeks each year traveling for business.

When his schedule allows, Walsh stays at defendant's house in Grand Rapids, Michigan, where he sleeps in the same bedroom as defendant. Whenever possible, defendant and Walsh exercise together, share meals, spend vacations and holidays together, and spend time with each other's children. April Piper, defendant's housemate in 2004 and 2005, testified that she saw Walsh's vehicle parked at defendant's house overnight between two and four times a week. Piper was uncertain, however, whether Walsh actually spent the night on all those occasions, as she acknowledged there were times when Walsh simply left his vehicle at the house while away on business travel.

Walsh testified that he does not keep any personal belongings at defendant's house, toiletries or otherwise, and that while he brings clothing to defendant's house, he does not leave it there and takes it back to his own house for cleaning. He does not receive any mail at defendant's home, with the exception of his judgment of divorce and subpoena for this case. Defendant's friends testified that they were aware of defendant's relationship with Walsh, but that they saw no evidence indicat-

ing that Walsh lived with defendant. Walsh estimated that he spent 30 to 35 nights with defendant in both 2004 and 2005, including vacations. Walsh also stayed with defendant at her house for four nights in January of 2006, and for a long weekend in March of 2006.

Walsh asked defendant to move to Georgia to live with him on various occasions dating back to 2004, and asked her to marry him on four or five occasions. However, defendant told Walsh that she did not want to marry or live together with anyone until her spousal support ends when her youngest child turns 18 years of age. Defendant and Walsh both testified that they have a committed, monogamous relationship and love each other. The couple does plan to marry in the future.

Defendant and Walsh do not share bank accounts, credit cards, or a cellular-telephone plan. They do not contribute to the payment of each other's bills, including daily living expenses or mortgage payments. When the couple travels together, they share the expenses. Walsh has offered advice to defendant regarding her rental properties and has assisted her with household projects related to her own home and the rental properties.

Considering the totality of the circumstances, defendant's relationship with Walsh is more accurately characterized as a committed, long-distance dating relationship, involving regular overnights together, than as two people "living together . . . as partners in life," or "dwelling together . . . in the manner of husband and wife." Walsh maintains a separate residence in Georgia, he does not keep personal items at defendant's house, he does not regularly receive mail there, the couple does not share personal property, they do not hold themselves out as living together, and they are not financially interdependent. Accordingly, the trial court did not

clearly err in finding that defendant and Walsh were not cohabitating, and it properly denied plaintiff's request to terminate spousal support on that basis.

III

Finally, defendant cross-appeals the trial court's denial of her request for attorney fees and costs under MCR 3.206(C).[3] We review a trial court's ruling on a request for attorney fees for an abuse of discretion. *Gates v Gates*, 256 Mich App 420, 437-438; 664 NW2d 231 (2003). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

"In domestic relations cases, attorney fees are authorized by both statute, MCL 552.13, and court rule, MCR 3.206(C)." *Reed v Reed,* 265 Mich App 131, 164; 693 NW2d 825 (2005). Attorney fees in a divorce action may be awarded "when a party needs financial assistance to prosecute or defend the suit." *Id.* That is, "a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support." *Gates, supra* at 438. Pursuant to MCR 3.206(C)(2)(a), the party requesting the fees must allege facts sufficient to show that he or she is "unable to bear the expense of the action, and that the other party is able to pay."

We agree with the trial court that defendant did not demonstrate that she was unable to bear the expense of

---

[3] Defendant requested attorney fees and costs in her written closing argument following the evidentiary hearing. Plaintiff's argument on appeal that the request was untimely and improperly made is without merit. MCR 3.206(C) does not require that a request for attorney fees be made in a separate motion, and provides that a party may request attorney fees "at any time." MCR 3.206(C)(1).

the action, and that plaintiff was able to pay, in accordance with MCR 3.206(C)(2)(a). Defendant's request for attorney fees and supporting affidavit were solely comprised of unsubstantiated assertions that, aside from spousal support used for living expenses, her income is "minimal," and that she would be unable to defend the action unless the trial court awarded her attorney fees. The trial court properly concluded that, in light of defendant's recent purchase of three income-producing rental properties, she had not demonstrated a need for financial assistance in defending the action. Defendant also asserted that there was a wide disparity in the incomes of the parties, but the record does not support this assertion. While defendant's affidavit listed plaintiff's alleged income from 1999-2003, defendant did not supply income-tax returns supporting those figures or any evidence regarding plaintiff's income in 2004 and 2005. Nor did defendant supply her own income-tax returns to substantiate the alleged disparity between the parties' incomes.

Additionally, defendant argues that the trial court improperly relied on the "American rule" in denying her request for attorney fees. We disagree. "Michigan follows the 'American rule' with respect to the payment of attorney fees and costs. Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award." *Haliw v Sterling Hts*, 471 Mich 700, 706-707; 691 NW2d 753 (2005) (internal citation omitted). The American rule is codified at MCL 600.2405(6), which provides that "[a]ny attorney fees authorized by statute or by court rule" may be awarded as costs. See *id.* at 707. Here, while the trial court stated that it was "a very big supporter of the American rule . . . that everybody has to carry the burden" of litigation, the

court acknowledged that attorney fees are authorized by MCR 3.206(C). The court ruled that defendant failed to demonstrate her need for financial assistance in defending the action, as required by MCR 3.206(C)(2)(a), and denied defendant's request for attorney fees on that basis.

Affirmed.